**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roger Mark Scott, | ) No. CV-97-1554-PHX-PGR |
| Petitioner, | ) <br> ) <u>DEATH PENALTY CASE</u> |
| v. | ) <br> ) **ORDER** |
| Charles L. Ryan, et al., | ) <br> ) |
| Respondents. | ) <br> ) |

The matter is before the Court on remand from the Ninth Circuit, *Scott v. Schriro*, 567 F.3d 573 (9th Cir. 2009) (per curiam), which reversed in part this Court's order denying Petitioner's habeas petition and directed the Court to hold an evidentiary hearing on Petitioner's ineffective assistance of counsel claims.

The parties filed prehearing briefs. (Docs. 222, 223, 226.) The hearing was held October 5–7, 2010, after which the parties submitted memoranda. (Docs. 255, 256.)

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted of first degree-murder, conspiracy to commit first-degree murder, and kidnapping for his involvement in the murder of Christopher Milke, a four-year-old child. He was sentenced to death.

On the afternoon of December 2, 1989, Christopher Milke was reported missing from a Phoenix shopping mall by James Styers, a friend of Petitioner and the roommate of Christopher's mother, Debra Milke.

Questioned by police, Petitioner initially denied involvement in Christopher's disappearance. In later interviews he confessed to his role in the crime, stating that he had driven Styers and Christopher to a desert wash where Styers shot Christopher three times in the back of the head. Petitioner claimed that about a week before the murder, Styers told him that he and Debra Milke planned to kill her son and wanted Petitioner's help. He stated that Milke said she wanted her son killed because she was not cut out to be a mother. She had an insurance policy on the boy's life and offered Petitioner $250 from the proceeds if he assisted Styers. After the murders Petitioner disposed of Styers' shoes in the mall parking lot. He concealed the murder weapon in a box in his closet. Following his confession Petitioner led detectives to Christopher's body.

Petitioner was represented at trial by Roland Steinle and co-counsel Bill Foreman. At sentencing Steinle advanced a number of mitigating factors, including Petitioner's remorse, cooperation with law enforcement, difficult family history, lack of prior felony convictions, love of family, history of alcohol abuse, good conduct while incarcerated, and psychological history. The trial court accepted as mitigating circumstances Petitioner's cooperation with law enforcement, good conduct, bond with his mother, and psychological history. (Ex. 2 at 12–15.) The court determined, however, that these circumstances were not sufficiently substantial to call for leniency when weighed against the aggravating factors, namely that the murder was committed for pecuniary gain, that the murder was especially heinous and depraved, and that the murder victim was a child under the age of 15. (*Id.* at 16–18.)

On direct appeal the Arizona Supreme Court affirmed Petitioner's conviction and sentence. *State v. Scott*, 177 Ariz. 131, 865 P.2d 792 (1993). In affirming the death sentence the court considered an additional mitigating circumstance, Petitioner's lack of a felony record, but held that it had "minimal significance" and concluded that "the death penalty is appropriate in this case under Arizona law." *Id.* at 145, 865 P.2d at 806.

- 2 -

1   Petitioner sought post-conviction relief ("PCR") on just one claim—that counsel had

2   been ineffective at sentencing for failing to proffer as mitigating evidence a request for

3   leniency by the victim's father.  The PCR court denied the petition and the Arizona Supreme

4   Court summarily denied a petition for review.  In a subsequent motion Petitioner, through

5   new post-conviction counsel, sought leave to file an amended PCR petition, which contained

6   several claims of ineffective assistance of counsel.  The PCR court denied the motion

7   pursuant to Ariz. R. Crim. P. 32.6(d).   The Arizona Supreme Court denied the Amended

8   Petition for Review without comment.

9   Petitioner commenced these habeas proceedings in 1997 and filed a second amended

10  habeas petition on July 26, 1999.  (Doc. 111.)  In an order dated March 31, 2000, the Court

11  dismissed a number of claims as procedurally barred, including all but one of Petitioner's

12  ineffective assistance of counsel claims.  (Doc. 119.)  On March 3, 2005, the Court entered

13  an order rejecting the remaining claim on the merits and denying the petition.  (Doc. 148.)

14  The Ninth Circuit reversed with respect to three of Petitioner's ineffective assistance of

15  counsel claims, on the grounds that the procedural rule invoked by the PCR court was

16  inadequate to bar federal review, and remanded the matter for an evidentiary hearing.  *Scott*,

17  567 F.3d 573.

18  **SCOPE OF REMAND**

19  At the conclusion of its opinion the Ninth Circuit enumerated the issues to be

20  considered on remand:

21

22      With respect to the following ineffective assistance of counsel claims,
    we reverse the district court's determination because the claims are not
23  procedurally defaulted and were exhausted: (1) that trial counsel rendered
    ineffective assistance of counsel because he failed to challenge the
24  voluntariness of Scott's statements to the police; (2) that trial counsel rendered
    ineffective assistance of counsel because he did not investigate and present
25  mitigating evidence of Scott's traumatic brain injuries and their effect on his
    mental processes during the sentencing phase; and (3) that appellate counsel
26  rendered ineffective assistance of counsel because he failed to challenge the
    trial court's finding Scott committed the crime for pecuniary gain. We remand
27  those claims to the district court for a resolution on the merits in the first
    instance. We affirm the district court's denial on the merits of Scott's claim

28

- 3 -

that his trial counsel was constitutionally ineffective for not presenting a recommendation for leniency from the victim's father as mitigation evidence. Nevertheless, the district court should reconsider whether this failure prejudiced Scott in light of the other factors the district court considers on remand.

*Id.* at 586. Petitioner has withdrawn his claim of ineffective assistance of appellate counsel. (Doc. 222 at 1.)

With respect to the second claim, Petitioner contends that the remand order directs a consideration of issues broader than Steinle's failure to present mitigating evidence of brain injury. Petitioner notes that the court's opinion discusses other factors, specifically counsel's failure to urge the State's plea offer as a mitigating circumstance. (Doc. 256 at 16–26; *see* RT 10/5/10 at 46–47.)[1]

As addressed below, this Court has considered all of the evidence presented at the evidentiary hearing regarding Steinle's performance at sentencing, including the issues specifically referenced by the Ninth Circuit. The Court's analysis will focus, however, on the allegation that Steinle performed at a constitutionally ineffective level in his presentation of mitigating evidence of Petitioner's brain injuries and their effect on his conduct at the time of the crimes.

## **EVIDENTIARY HEARING**

Petitioner presented five witnesses: Mark Milke, Christopher's father; Tom Gorman, a criminal defense attorney with extensive experience in capital litigation, who testified as an expert on the standard of care for capital defense attorneys at the time of Petitioner's trial; Russell Stetler, Mitigation Coordinator for the Federal Public Defender (FPD) system, who also testified about the standard of care for capital attorneys, specifically with respect to mitigation; Dr. Tora Brawley, a neuropsychologist who examined Petitioner and prepared a report in 2006; Dr. Thomas Hyde, a neurologist and neuroscientist who examined Petitioner and prepared a report in 2010; and Mary Durand, an investigator who worked in the field of

---

[1] "RT" refers to the transcripts prepared by the court reporter.

- 4 -

capital mitigation in Arizona at the time of Petitioner's trial.[2]

Respondents presented three witnesses: Dr. James Seward, a neuropsychologist and forensic psychologist, who examined Petitioner and prepared a report in 2010; Roland Steinle, Petitioner's trial counsel; and Dr. Harry Tamm, a neurologist who performed a CT scan of Petitioner in 1987 and who, in preparation for his testimony at the evidentiary hearing, reviewed Petitioner's medical records and the reports of the other experts.

## DISCUSSION

**(1)     Did trial counsel render ineffective assistance by failing to challenge the voluntariness of Petitioner's statements to the police?**

Background

Police first contacted Petitioner at his home at 12:45 a.m. on December 3. (Ex. 31 at 1.) He told them that the day before, December 2, Styers had dropped him off near his home after running some errands. (*Id.* at 2.) Petitioner then walked to a convenience store where he ran into an old acquaintance named Phil. (*Id.*) They went to the mall together but became separated. (*Id.*) While he was looking for Phil, Petitioner ran into Styers and learned that Christopher was missing. (*Id.*)

At around 2:15 a.m. the police returned to Petitioner's home and asked him come to the station to give a more detailed statement. He went voluntarily.

At the station Petitioner repeated the "Phil" story in a statement to Detective Ron Jones. Petitioner was interviewed later that morning and repeated the same story, including in a taped interview with Jones at 4:18 a.m. (Ex. 32.)

---

[2]     Petitioner called Durand as a rebuttal witness to Steinle's testimony about the standard of practice in capital sentencing proceedings in Arizona at the time of Petitioner's trial. She testified that seminars and other education opportunities on the topic of mitigation were available at the time and that in her work on capital cases she had held herself out specifically as a "mitigation specialist." (RT 10/6/10 at 381–86.) In a later filing she clarified that at the relevant time period she performed mitigation duties under the title of investigator. (Docs. 245, 246.)

At around 11:00 a.m., Detective Robert Mills interviewed Petitioner, who continued to repeat his story.  (Ex. 33.)  At 12:50 p.m. Detective Armando Saldate took over the interview.  (Ex. 34 at 1.)  He also read Petitioner his *Miranda* rights and told him that he didn't believe the Phil story.  (*Id.*)  Petitioner admitted that Phil did not exist.  (*Id.*)  Saldate informed Petitioner that he believed Petitioner was involved in the child's disappearance.  (*Id.* at 2.)  At approximately 3:30 p.m., Petitioner asked for cigarettes and a soda.  (*Id.* at 3.)  Saldate replied that he would provide the items but first it was necessary for Petitioner to tell him the whole truth.  (*Id.*)  He also told Petitioner that in order to confirm his story officers would be sent to interview his mother at the apartment they shared.  (*Id.*)  Petitioner "immediately responded that it would kill her."  (*Id.*)  He then repeated his request for cigarettes and a Mountain Dew, which Saldate provided.  (*Id.*)  At that point Petitioner admitted his involvement and told Saldate that he knew the location of Christopher's body.  (*Id.* at 3.)  Petitioner gave Mills a detailed tape-recorded statement at 8:00 p.m.  (Ex. 35.)

Following a hearing on the issue, the trial court found that the statements were voluntary.  The Arizona Supreme Court likewise rejected Petitioner's argument that his confession was the result of improper and coercive police conduct consisting of the deprivation of food, sleep, and medication, together with Det. Saldate's statement that the police would be sent to question Petitioner's mother.  *State v. Scott*, 177 Ariz. 131, 136–37, 865 P.2d 792, 797–98 (1993).  In upholding the trial court's finding of voluntariness, the supreme court explained:

> When police officers arrived at defendant's residence at 2:15 a.m., defendant voluntarily agreed to accompany them to the police station.  He was transported in an unmarked and uncaged police car, and was not handcuffed.  . . .  At 11:00 a.m., after defendant had been with the police for several hours, Detective Mills interviewed him.  Mills testified that defendant did not appear "overly tired," and that he was alert and aware of the situation.  Mills was aware that defendant was taking prescription medication; however, defendant never requested any medication.
>
> Nothing suggests that any lack of medication had an adverse effect on defendant.  In fact, the taped statement indicates that defendant received his medication that afternoon, though Detective Mills did not remember him

1
2
3
4
5

taking it. Throughout the investigation, defendant was provided with soft drinks and cigarettes upon request; thus, it is reasonable to assume that had defendant asked to sleep, eat, or take his medication, the police would have responded similarly and provided these things. Detective Mills bought both himself and defendant dinner before defendant made the taped confession. Indeed, in his taped confession, defendant stated that the police had "[b]een pretty nice" to him. . . . Despite the fact that defendant had been at the police station for nearly 14 hours before he made any incriminating statements, there is no evidence to suggest overreaching or misconduct by the police.

6
7
8
9
10
11

        The trial court obviously found that Saldate's statement did not coerce defendant's confession. The record reflects no improper motivation. Saldate took over the interview at 12:50 p.m. At 3:35 p.m. defendant confessed to Saldate. During that time, Saldate and defendant discussed several subjects, including the fact that defendant lived with and cared for his elderly mother. Defendant admitted that he made up the "Phil" story, the story that he was at Metrocenter with Styers and Christopher, and the story that Christopher disappeared at the mall. Saldate told defendant he thought defendant knew something about the disappearance and he wanted the truth. Defendant claims he confessed only after Saldate threatened to send police to his mother's house because he felt that would be too much for his elderly mother to handle.

12
13
14
15
16

        The trial court was justified in finding that Saldate used no improper influence. Saldate did nothing improper when he suggested that police would be sent to defendant's residence to talk to his mother. . . . Defendant waived his *Miranda* rights and answered questions for two hours before Saldate mentioned sending police to speak to defendant's mother. Saldate was being honest with defendant when he said that police would verify his story by questioning his mother. Furthermore, there was no promise that police would not speak to defendant's mother if he confessed.

17
18
19
20
21
22

        We cannot say that defendant's statements were the result of anything but his own compulsion to tell the truth. We also affirm the trial court's finding that defendant voluntarily and knowingly waived his *Miranda* rights when read by Saldate, and later by Mills. Police did not threaten or intimidate defendant into waiving his rights. In fact, he had been volunteering the "Phil" story for several hours and continued with the story for two hours after he was given his *Miranda* warnings. There is also no evidence that defendant exhibited "objective signs of distress, confusion, or incomprehension," before he was read his *Miranda* rights. Defendant answered questions freely and did not ask for an attorney or attempt to terminate the interview.

23
*Id.*

24
    <u>Analysis</u>

25
    The Court's analysis proceeds under a de novo standard of review. Scott, 567 F.3d

26
at 584. Applying that standard, the Court finds that Petitioner is not entitled to relief.

27
    Claims of ineffective assistance of counsel are governed by the principles set forth in

28

*Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 130 S. Ct. 383, 384 (2009) (per curiam); *Bobby v. Van Hook*, 130 S. Ct. 13, 16 (2009) (per curiam).  Thus, to satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*  "The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687-88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In evaluating the voluntariness of a confession, "the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990) (citing *Haynes v. Washington*, 373 U.S. 503, 513–14 (1963)).  Coercive police activity, including lengthy questioning, deprivation of food or sleep, physical threats of harm, and psychological persuasion, is a necessary predicate to a finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Personal characteristics of the suspect, such as age and mental

1    capacity, are constitutionally irrelevant absent proof of coercion. *See Derrick*, 924 F.2d at

2    818; *see also Mincey v. Arizona,* 437 U.S. 385, 398 (1978) (The fact that a suspect is under

3    the influence of drugs or medication is irrelevant if the statement was "the product of a

4    rational intellect and a free will") (quoting *Townsend v. Sain,* 372 U.S. 293, 307 (1963)).

5         In discussing this ineffective assistance claim, it must be noted that Steinle did not

6    "fail[] to challenge the voluntariness of Scott's confessions to the police." *Scott*, 567 F.3d

7    at 586.  In fact, counsel argued that the confession was involuntary and moved for a hearing.

8    (Ex. 208.)

9         In his habeas petition, Petitioner did not allege that counsel failed to challenge the

10   voluntariness of the confession but that counsel performed ineffectively during the

11   voluntariness hearing by failing to call a number of witnesses, including detectives who

12   interviewed Petitioner, Petitioner's mother, a mental health expert (Dr. Donald Tatro), and

13   Petitioner himself. (Doc. 112 at 32–34.)  According to Petitioner, Dr. Tatro, who performed

14   a Rule 11 competency examination, would have testified that Petitioner's "fragile mental

15   state," including his "inability to withstand . . . pressure" and "how he reacts to authority

16   figures," called into question the voluntariness of his confession to Saldate.  (*Id.* at 33–34.)

17        At the voluntariness hearing, Mills and Saldate, the detectives to whom Petitioner

18   made his confessions, both testified and were cross-examined about the circumstances of the

19   interrogations and their conduct in securing the confessions.  (RT 1/14/91 at 20–29, 32,

20   58–69.)  Steinle questioned Saldate and Mills about Petitioner's physical condition in an

21   attempt to show that prior to his confessions Petitioner was subjected to a series of interviews

22   and throughout that time he had been deprived of sleep, food, and medication.  (*Id.*)  Counsel

23   also examined Saldate about his statement to Petitioner that police officers would visit

24   Petitioner's mother at her home.  (*Id.*)  During his closing argument Steinle asserted that the

25   circumstances of the interview—its duration, Petitioner's condition, and Saldate's statement

26   about contacting Petitioner's mother—rendered the confession involuntary.  (*Id.* at 71–77.)

27

28

Steinle called no witnesses at the hearing.  On Steinle's advice Petitioner waived his right to testify.  (RT 1/14/91 at 69–70.)

### 1.    *Deficient performance*

Counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690.  Petitioner's burden with respect to the allegations in this claim is especially difficult to meet because "the advice provided by a criminal defense lawyer on whether his client should testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) (internal quotation omitted); *see United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (counsel not ineffective for failing to call defendant to the stand, despite defendant's repeatedly expressed desire to testify, because "[i]t was a reasonable tactical decision to rely exclusively on attacking the Government's witnesses and presenting independent testimony rather than to subject [defendant] to all of the risk attendant on cross-examination"); *Smith v. Jones*, 923 F.2d 588, 590 (8th Cir. 1991) (strategic decision not to call defendant to testify, based on concerns about his credibility, was not ineffective assistance); *United States v. Dyer*, 784 F.2d 812, 817 (7th Cir. 1986) (decision whether defendant should testify is a "tactical choice of trial strategy" and thus not subject to review).  An attorney's decision to advise a client not to testify does not constitute ineffective assistance when it is reasonable to conclude that the client's testimony would be more damaging than beneficial. *Hollenbeck v. Estelle,* 672 F.2d 451, 453–54 (5th Cir. 1982).

Petitioner, notwithstanding his presentation of testimony on the issue from attorney Gorman, has failed to satisfy his burden of proving that Steinle's litigation of the voluntariness issue was deficient under *Strickland*.

At the evidentiary hearing Gorman testified that Steinle's performance fell below prevailing professional norms.  He cited Steinle's failure to "front load" a mitigation

investigation, which would have led to the discovery of issues regarding Petitioner's cognitive abilities and personality traits that would have been relevant to a consideration of the voluntariness of the confession. (RT 10/5/10 at 79–80.) He further testified that Steinle's failure to call Petitioner as a witness at the voluntariness hearing constituted deficient performance because only Petitioner could have explained his mental state at the time of the confession and the effects of Saldate's interrogation techniques. (*Id.* at 83.)  According to Gorman, there was no strategic basis for declining to call Petitioner, because his testimony at the hearing could not have been used against him at trial.  (*Id.* at 84.)  Gorman added that Steinle did not present sufficient evidence of the circumstances of the interrogation; he failed call the other officers who interviewed Petitioner prior to his confession, and his cross-examination of Detectives Mills and Saldate was ineffectual.[3]  (*Id.* at 84–85.)  Finally, Gorman stated that he would have called an expert to testify at the voluntariness hearing, but that Dr. Tatro was neither the right kind of expert nor prepared to testify. (*Id.* at 108–09.) Instead, according to Gorman, Steinle should have retained a neuropsychologist who could have testified about Petitioner's cognitive deficits and the effects of sleep deprivation on his ability to voluntarily waive his *Miranda* rights.  (*Id.* at 85.)

Steinle testified at the evidentiary hearing.  A Maricopa County Superior Court judge since 2001, Steinle had 14 years of experience as a criminal defense attorney at the time of Petitioner's trial.  (RT 10/6/10 at 273–74.)  Steinle indicated that he made a considered,

---

[3]     As evidence of Steinle's deficient performance, Gorman cited a memorandum prepared by Garrett Simpson, a Maricopa County Public Defender who briefly represented Petitioner on appeal.  (Ex. 54.)  Simpson identified two "colorable" ineffective assistance claims, one of which concerned Steinle's failure to present Petitioner's testimony at the voluntariness hearing—specifically, testimony that he confessed and consented to a search of his residence only after Saldate threatened to interrogate his mother and tear their apartment apart.  (*Id.* at 1.)  The fact that Simpson thought this claim was colorable and would be raised on appeal does not affect the Court's assessment of its merits.  Simpson himself emphasized that he was not alleging that Steinle's performance was ineffective.  (*Id.* at 2.)

1    tactical decision, after discussing the matter with co-counsel and Petitioner, not to call

2    Petitioner or Dr. Tatro to testify at the voluntariness hearing.  (*Id.* at 305.)  While he did not

3    recall the details of the decision, Steinle testified that "generally I would not necessarily put

4    a person on the stand in a voluntariness hearing, especially if I intended to put them on at trial

5    if I didn't think I could win the voluntariness hearing."  (*Id.* at 307, 326.)

6        Steinle indicated that his approach to the voluntariness hearing was informed by the

7    fact that Petitioner's confession was recorded, thus limiting his ability to argue that the

8    statement was coerced.[4]  (*Id.* at 304–05.)   Nonetheless, at the voluntariness hearing he

9    attempted to address the "totality of the circumstances" surrounding the interrogation through

10   his cross-examination of the State's witnesses, Saldate and Mills.  (*Id.* at 340–41.)  As noted

11   above, in questioning the detectives Steinle placed before the judge the relevant

12   circumstances of Petitioner's interrogation, including its length, Petitioner's mental and

13   physical condition, and Saldate's comments about interviewing Petitioner's mother.  (*Id.*)

14   He reiterated these points in his closing argument.  (*See id.* at 327.)

15       Although Gorman stated that Petitioner's testimony could not have been used against

16   him at trial, in fact it is likely that the State could have used any inconsistent testimony from

17   that hearing to impeach Petitioner's trial testimony.   *See, e.g.*, *United States v. Beltran-*

18   *Gutierrez*, 19 F.3d 1287, 1289 (9th Cir. 1994) (holding that defendant's decision to take

19   stand at suppression hearing to protect his Fourth Amendment rights did not preclude use of

20   his testimony at trial for purposes of impeachment.); *United States v. Jaswal*, 47 F.3d 539,

21

22

23       [4]     At the outset of his taped interview with Det. Mills, Petitioner indicated that
24   he had voluntarily accompanied officers to the police station, that the officers had not used
     force or coerced him, that he had been given sodas and had just eaten a hamburger, and that
25   the detectives had "[b]een pretty nice to me." (Ex. 35 at 3–5.)  At the close of the interview,
     after detailing his role in the murder, Petitioner again confirmed that the officers had made
26   no promises or threats.  (*Id.* at 28.)  He also discussed his physical and mental condition,
     indicating that he'd had something to eat and taken his medication (dilantin, for seizures),
27   and that he felt better after telling his story.  (*Id.* at 28–29.)

28

543 (2d Cir. 1995) ("Prior inconsistent suppression hearing testimony may properly be used to impeach a defendant during trial."); *Reinert v. Larkins*, 379 F.3d 76, 96 & n.5 (3d Cir. 2004) ("By taking the stand at the suppression hearing, Reinert may have been providing the Commonwealth with the means to impeach his testimony.") (citing *United States v. Salvucci,* 448 U.S. 83, 93–94 (1980)).[5]  Steinle was also aware that the prosecutor was an experienced attorney whose cross-examination of Petitioner would have been thorough.  Hence there is abundant support in the record for the presumption that Steinle performed reasonably in his decision not to call Petitioner as a witness at the voluntariness hearing.

In support of this claim Petitioner cites *Bynum v. Lemmon*, 560 F.3d 678, 684–85 (7th Cir. 2009), where the court ruled that defense counsel performed deficiently by failing to call the defendant to testify that his confession was coerced.  Instead, like Steinle, counsel simply cross-examined the officers.  *Id.*  *Bynum* is not persuasive.

In *Bynum* two contradictory versions of the interrogation existed.  At the voluntariness hearing the officers testified that they never threatened or coerced Bynum and he never asked for counsel, requested food, or appeared tired or unwilling to answer questions.  *Id.* at 681. According to Bynum, however, the officers physically threatened him when he asked for a lawyer, handcuffed him to a chair for nine hours, and refused to provide food or water or allow him to use the bathroom.  *Id.*  They also threatened to bring charges against his fiancee and place his son with child protective services.  *Id.*  Under these circumstances, the Seventh Circuit explained, it was imperative to present Bynum's testimony at the suppression hearing because his "account of the officers' coercive conduct was the only available evidence of coercion."  *Id.* at 684.

---

[5]      In *Salvucci*, the Supreme Court reserved the question whether *Simmons v. United States*, 390 U.S. 377 (1968), precludes the use of a defendant's testimony at a suppression hearing to impeach his testimony at trial. 448 U.S. at 93–94. The Court noted, however, that a number of courts considering the question had held that such testimony is admissible as impeachment evidence. *Id.* at 94 & n.8.

1    In Petitioner's case, by contrast, none of the elements he cites to establish coercive
2    conduct is disputed.  Presenting Petitioner's testimony would not have resulted in new
3    evidence concerning the length of the interrogations, the amount of time Petitioner had been
4    without sleep, his access to medication, food, and beverages, Saldate's comments about
5    contacting Petitioner's mother, or the contents of Petitioner's tape-recorded confession.  With
6    respect to the officers' conduct, there was only one version of events, so Steinle's decision
7    not to present Petitioner's testimony, unlike the approach followed by Bynum's counsel, was
8    strategically reasonable.

9          Next, with respect to presenting expert testimony at the voluntariness hearing from
10   Dr. Tatro (as argued in Petitioner's pre-hearing brief) or from another mental health expert
11   (as suggested by Gorman at the evidentiary hearing), Petitioner fails to rebut the presumption
12   that Steinle's decision not to present such evidence was reasonable.  Steinle could not
13   remember the details of his decision not to call Dr. Tatro at the voluntariness hearing, but
14   given *Strickland*'s "strong presumption" that counsel's actions are strategically sound, 466
15   U.S. at 689, Steinle's lack of recall does not affect this Court's assessment of his
16   performance.  The reasonableness of Steinle's decision not to call for Dr. Tatro's testimony
17   is bolstered by the fact that Tatro, like Dr. Don, who also evaluated Petitioner pursuant to
18   Rule 11, found Petitioner competent to waive his constitutional rights.  (*See* Ex's 11, 13.)
19   Given the opinions of Drs. Tatro and Don, along with the limited evidence of coercive police
20   conduct—a necessary prerequisite for a finding that the confession was involuntary—it was
21   reasonable for Steinle not to pursue additional expert opinions concerning Petitioner's mental
22   state at the time of the interrogations.  Steinle had no reason to believe that such testimony
23   would have been relevant or beneficial in litigating the voluntariness issue.

24          In sum, Gorman's testimony about the quality of Steinle's performance with respect
25   to the voluntariness issue is not persuasive.  Petitioner has failed to meet his burden with
26   respect to the deficiency prong.

27

28
                                                    - 14 -

1
  2.     *Prejudice*

2       Petitioner offers no evidence to meet his burden of proving he was prejudiced by

3   counsel's handling of the voluntariness hearing.[6]  Gorman's testimony addressed only the

4   deficiency prong of *Strickland*.  Petitioner did not testify at the evidentiary hearing; nor did

5   any of the officers who conducted the interrogation.   Indeed, there is no suggestion that

6   Petitioner wished to testify at the voluntariness hearing before the trial court or that he would

7   have testified if Steinle had so advised.  (*See* RT 10/6/10 at 306.)  More significantly, there

8   is no indication that his testimony would have assisted Steinle in establishing that the

9   confession was involuntary.  The evidence is to the contrary.

10      As noted above, absent coercive police conduct, Petitioner's personal characteristics

11  are irrelevant to the voluntariness issue. *Connelly*, 479 U.S. at 167; *Derrick*, 924 F.2d at 818

12  ("[T]his part of Derrick's argument assumes that the police behavior in question here was

13  acceptable absent Derrick's own unique circumstances.  Such a claim is precisely the type

14  that *Connelly* was intended to foreclose.").  The testimony at the voluntariness hearing placed

15  before the judge all the relevant information concerning the conduct of Saldate and Mills and

16  the circumstances of the interrogations. The Arizona Supreme Court considered the evidence

17  and ruled that it did not show the confession was involuntary. *Scott*, 177 Ariz. at 136–37,

18  865 P.2d at 797–98.  Adding testimony from other officers who interviewed Petitioner prior

19  to his confessions would not have provided additional information to support the allegation

20

21

22

23

24          [6]     To establish prejudice Petitioner "must show that, had he testified, there was
    both a reasonable probability that he would have prevailed on the motion to suppress and a
25  reasonable probability that, if his confessions were suppressed, he would have been
    acquitted." *Bynum v. Lemmon*, 560 F.3d 678, 685 (7th Cir. 2009).  The Court assumes that
26  if Petitioner's confession had been suppressed, there was a reasonable probability he would
    not have been convicted.  The Court therefore will only discuss the effect of Steinle's
27  performance on the outcome of the suppression motion.

28

that the confessions were coerced.[7]

Testimony about Petitioner's mental state from Dr. Tatro, from a different expert, as suggested by Gorman, or from Petitioner himself would not have affected the trial judge's determination that detectives did not engage in the kind of coercive conduct that is a prerequisite to a finding that the confession was involuntary. Therefore, counsel's failure to present such testimony did not prejudice Petitioner under *Strickland*. *See Clabourne v. Lewis*, 64 F.3d 1373, 1379 (9th Cir. 1995) (rejecting claim that counsel performed ineffectively by failing to present effects of Thorazine on petitioner's mental state where there was "no evidence of coercion by the police"); *Atkins v. Singletary*, 965 F.3d 952, 959 (11th Cir. 1992) (finding no prejudice from counsel's failure to present expert testimony on voluntariness where "the record shows no improper or coercive state tactics"); *see also Matylinsky v. Budge*, 577 F.3d 1083, 1095–96 (9th Cir. 2009) (counsel did not perform ineffectively at voluntariness hearing by failing to present evidence, beyond cross-examination of state's witnesses, to support claim that petitioner was intoxicated and incapable of voluntarily waiving his *Miranda* rights).

Furthermore, Petitioner has not presented evidence that Petitioner's neurological or cognitive defects rendered him vulnerable to coercion during the interrogation. Although

---

[7]    Trial testimony does not support Petitioner's claim that counsel performed ineffectively in litigating the voluntariness issue. Detectives Mills and Saldate testified as they had at the voluntariness hearing. (*See* RT 1/17/91 at 50–77; RT 1/21/91 at 23–49, 106–12; RT 1/22/91 at 47–64.) Testimony from other officers who interviewed Petitioner added no new details that would support a finding of coercion. (*See, e.g*, RT 1/24/91 at 55, 68, 72, 78–79, 84–85; RT 1/28/91 at 19–21, 59–60.) Finally, Petitioner's trial testimony did not supply additional evidence that the police used coercive tactics. (*See* RT 1/31/91 at 50–59, 74–75.) At the close of trial the court also instructed the jury: "You must not consider any statements made by the Defendant to a law enforcement officer unless you determine beyond a reasonable doubt that the Defendant made the statement voluntarily. A defendant's statement was not voluntarily made if it resulted from the defendant's will being overcome by a law enforcement officer by use of any sort of violence, coercion or threats, or by any direct or implied promises, however slight." (RT 2/6/91 at 130.) The jury convicted Petitioner.

Gorman opined that Steinle should have retained a neuropsychologist to testify at the voluntariness hearing about the effects of Petitioner's cognitive defects and sleep deprivation on "his ability to waive a fundamental right or to have his will overborne" (RT 10/5/10 at 85), Petitioner has not demonstrated that Steinle could have obtained an expert opinion in support of such a diagnosis. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculation as to what expert might say "is insufficient to establish prejudice"); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir.1997). Further, the dynamics of the interrogation do not suggest that Petitioner's neurological status made him vulnerable to coercion. During his contact with the police Petitioner did not exhibit the characteristics associated with his current diagnoses of frontal lobe damage and cognitive defects.[8] To the contrary, rather than losing control of his emotions or "decompensating" during the stress of the interrogations, Petitioner maintained his composure and conducted himself rationally, repeating the fabricated "Phil" story before eventually acknowledging his involvement in the crime. Thus, Steinle's omission of expert testimony of the kind advocated by Gorman, assuming it could have been procured, would not have affected the trial court's determination that Petitioner's confession was voluntary. *See, e.g.*, *Shackleford v. Hubbard*, 234 F.3d 1072, 1080–81 (9th Cir. 2000) (defendant failed to show reasonable probability that, had his counsel submitted evidence of his drug use, fatigue, and mental deficiencies at suppression hearing, defendant's waiver of his *Miranda* rights would have been found not to be valid, or that confession would have been suppressed; defendant was "coherent and articulate throughout the interrogation").

Petitioner has failed to demonstrate that Steinle's performance resulted in the omission of evidence that would have shown coercive conduct by the police. Because the evidence does not support a predicate finding of coercive conduct, counsel's failure to present mental-state evidence from Petitioner or from Dr. Tatro or another expert witness did not result in

---

[8] The Court addresses below the experts' testimony concerning the existence of these deficits at the time of the interrogations.

prejudice.  There is not a reasonable probability that such an approach would have led the trial court to suppress Petitioner's confession.  *See Bynum*, 560 F.3d at 685–86.  Therefore, upon de novo review, the Court concludes that Petitioner's claim that counsel performed ineffectively in failing to challenge the voluntariness of his confession is without merit.

**(2)   Did trial counsel render ineffective assistance at sentencing by failing to investigate and present mitigating evidence of Petitioner's traumatic brain injuries and their effect on his mental processes?**

<u>Background</u>

Because Petitioner is entitled to relief on this claim only if he makes a preliminary showing that at the time of his crime and trial, in 1989–91, he suffered from traumatic brain injury that affected his mental processes, the Court first addresses the evolving record of Petitioner's mental and neurological status.

    *1.    State court proceedings*

Prior to trial Steinle filed a Rule 11 motion requesting an examination of Petitioner's mental condition to determine both his competency to stand trial and his mental state at the time of the offense.  (Ex. 55.)  The motion cited information provided by Petitioner that he suffered from "brain shrinkage" due to head injuries which affected his memory.  (*Id.*)  Steinle requested that the court "specifically ask the doctors to address the issues of his head injuries in the past and his medication."  (RT 4/10/90 at 3.)  Steinle and the prosecutor stipulated that the Rule 11 exams would be performed by Dr. Donald Tatro, a psychologist, and Dr. Alexander Don, a psychiatrist.  (Ex. 203.)

Dr. Tatro performed a clinical interview and administered the Bender Visual-Motor Gestalt Test, the Figure Drawing Test, and the Sentence Completion Test.  (Ex. 13 at 10.) In his report, dated August 2, 1990, he diagnosed Petitioner with generalized anxiety disorder with obsessive-compulsive and hysterical features, obsessive-compulsive and histrionic personality disorder, and passive-aggressive personality disorder.  (*Id.* at 16.)  Despite these neuroses, Dr. Tatro found that Petitioner was not "seriously out of touch with reality, or

psychotic" and that Petitioner's "paranoid feelings do not appear to be associated with delusional thinking." (*Id.* at 6.) He determined that Petitioner was competent to stand trial. (*Id.* at 14.) In describing Petitioner's mental condition at the time of the crime, Dr. Tatro suggested that features of Petitioner's personality—his anxiety, difficulty in communicating, and desire to avoid conflict—could lead him to become the "dupe" or "unwitting accomplice" of a person like Styers. (*Id.* at 15.)

Dr. Tatro's report includes background information provided by Petitioner. Petitioner's family moved to Phoenix from Omaha when he was 11. (*Id.* at 6.) He had an older brother who was mentally retarded. (*Id.*) His father, an alcoholic who physically abused the children and their mother, abandoned the family when Petitioner was five. (*Id.*) Petitioner's grades declined when he moved to Phoenix. (*Id.* at 8.) He dropped out of school in 10th grade but later obtained a GED. (*Id.*) He got married at 21 and divorced three years later. (*Id.*)

Petitioner reported that he used to drink heavily, two fifths of whiskey per day, but had tapered off five years earlier. (*Id.* at 9.) He also told Dr. Tatro that he was involved in a motorcycle accident, injuring his back and scarring his arm. (*Id.* at 7, 9.) Dr. Tatro's report does not mention head injuries or a CT scan.

Dr. Don performed a clinical psychiatric examination, including a "mental status examination," and reviewed records forwarded by Steinle, including police and witness reports and Petitioner's Correctional Health Services medical file. (Ex. 11 at 1.) In a report dated July 2, 1990, Dr. Don diagnosed Petitioner with alcohol abuse; obsessive-compulsive personality traits, not sufficient to warrant diagnosis of personality disorder; seizure disorder; and asthma. (*Id.* at 8.) He noted that Petitioner had a history of seizures but they were currently "well controlled." (*Id.* at 3.) Dr. Don's report also recounted Petitioner's head injuries, the first of which occurred in 1973 or 1974 when Petitioner was involved in a motorcycle accident which left him unconscious for 20 minutes and resulted in

hospitalization.  (*Id.* at 4.)  A second head injury, caused by a car accident, led to a briefer period of unconsciousness.  (*Id.*)  Petitioner described himself as an alcoholic who began drinking at age 16 but had reduced his consumption 10 years earlier.  (*Id.*)

Dr. Don concluded that Petitioner was not delusional, that his recent memory was intact and he had normal memory functioning, that he was oriented in all three spheres, that there was no impairment of abstract reasoning, that he was of average intelligence, and that there were no signs of dementia or a psychotic disorder.  (*Id.* at 6.)  He determined that Petitioner was competent to stand trial and waive his constitutional rights.  (*Id.* at 8–9.)  He also found that Petitioner suffered from no mental disease or defect at the time of the offense and that his statements to the police evidenced "normal rational and logical faculties" with no "memory or concentration impairment."  (*Id.* at 9.)  The report does not refer to Petitioner's alleged brain shrinkage or a prior CT scan.

Steinle called Dr. Tatro to testify at trial.  As he did in his Rule 11 report, Dr. Tatro detailed various aspects of Petitioner's personality, including his passivity, weakness, need to please, and dependence on others.  (RT 2/4/91 at 78–90.)  According to Dr. Tatro, a passive-aggressive individual like Petitioner "puts on a compliant, conforming front and goes along with other people's demands, expectations, requests."  (*Id.* at 86.)  Dr. Tatro also explained the manifestations of Petitioner's obsessive-compulsive personality traits, which included a desire for self-control, a hesitancy to act for fear of making an error, and a tendency toward "rationalization and intellectualization or procrastination."  (*Id.* at 78–79.)

Dr. Don testified at trial and at the presentence hearing on behalf of the State.  In his trial testimony he stated that Petitioner suffered a head injury in 1973.  (*Id.* 139.)  He testified, however, that the screening tests he administered revealed "no evidence that [Petitioner] had any organic brain damage."  (*Id.* at 143.)  He also saw no impairment in Petitioner's memory.  (*Id.* at 144.)

At the presentence hearing Dr. Don acknowledged that Petitioner claimed to suffer

from brain shrinkage and memory loss.  (RT 4/5/91 at 63.)  He testified that "there were no specific neurological investigations done, such as a CT scan, which might demonstrate, quote, unquote, brain shrinkage.  But there was nothing clinically that I could find to suggest that this was present."[9]  (*Id.*)  He further testified, "[D]oes [Petitioner] have any organic alcohol-related brain disease.  And the answer is no, he doesn't have any.  And that would be, producing a psychosis or dementia as a result of chronic alcohol abuse, and there's no indication that he has that." (*Id.* at 69.)

Steinle did not call any witnesses at the presentence hearing.  He prepared a 30-page "mitigation memorandum" in which he cited, among other mitigating circumstances, Petitioner's difficult family background, history of alcohol abuse, and psychological history. (Ex. 56.)  With respect to the latter, Steinle relied on Dr. Tatro's report to argue that Petitioner suffered from impaired capacity at the time of the offense. (*Id.* at 16–20.)  Steinle emphasized that Petitioner's "personality . . . makes him the perfect dupe for Styers manipulation" and that "Styers is able to use Scott's passivity to accomplish everything he wants." (*Id.* at 19.)

In 1996 Dr. John DiBacco, a psychologist, evaluated Petitioner and prepared a report addressing Petitioner's competence to waive his PCR proceedings.  (Ex. 16.)  The report states that Petitioner had been in a motorcycle accident in 1973; he injured his back and was unable to return to work. (*Id.* at 2.)  Petitioner denied a history of binge drinking and stated that he quit drinking in 1985, though Dr. DiBacco suspected that Petitioner minimized his alcohol use. (*Id.* at 2, 5.)  The report notes that Petitioner had experienced seizures but they had been controlled by medication since 1983. (*Id.* at 2.)  Dr. DiBacco determined that Petitioner had a full scale IQ of 90. (*Id.* at 4.)  He concluded that Petitioner  "has at least

---

[9]        As discussed below, Petitioner received CT scans in 1985, 1987, and 1988. Dr. Don's testimony otherwise was presumably the result of Steinle's failure to provide Petitioner's medical records.

average intelligence with no discernible cognitive deficiencies" and is "capable of self-regulation and understanding most matters." (*Id.* at 5.) Dr. DiBacco reached the following diagnoses: rule out dysthymic disorder; anxiety disorder; personality disorder with schizoid, avoidant, borderline, and antisocial features; and reported seizure disorder. (*Id.* at 6.) The report does not mention head injuries or brain atrophy.

### 2. Federal habeas proceedings

Several experts examined Petitioner during these habeas proceedings and testified at the evidentiary hearing. The following is a summary of their findings and testimony.

#### Dr. Tora Brawley

In July 2006, Dr. Brawley, a clinical psychologist from South Carolina, performed a "full neuropsychological evaluation in order to determine current cognitive and emotional functioning." (Ex. 8.) Dr. Brawley reported that Petitioner had a "history of multiple head injuries, seizure disorder, and extensive alcohol use." (*Id.* at 1.) She also referred to a 1987 CT scan that "revealed the presence of atrophy which was reported as unusual for his age at the time." (*Id.*) According to Dr. Brawley, Petitioner's head injuries included a bike accident in seventh grade resulting in unconsciousness; a car accident in 1971, likewise resulting in unconsciousness; another car accident, in 1973, again resulting in unconsciousness; and a motorcycle accident in 1974, resulting in unconsciousness. (*Id.* at 2.) Petitioner reported to Brawley that he began experiencing seizures at age 35, averaging two per year. (*Id.*) The seizures ended in 1999 and have been controlled through medication. (*Id.*) Petitioner reported his history of alcohol consumption, indicating that for a period of three years he drank a fifth of liquor per day, with the last use occurring in 1985. (*Id.*)

Dr. Brawley diagnosed Petitioner in the low average range of intellectual functioning, with a full scale IQ of 88. (*Id.* at 3.) She found deficits in executive/frontal lobe functioning and motor functioning. (*Id.*) Dr. Brawley explained that frontal lobe deficits may result in poor judgment and an inability to understand consequences. (*Id.*) She concluded that

Petitioner "may benefit from a neurological consultation" concerning the "possibility of an underlying neurological condition." (*Id.* at 4.)

At the evidentiary hearing Dr. Brawley testified that several of her findings could be indicative of frontal lobe damage. (RT 10/6/10 at 219.) These include deficits in Petitioner's executive, motor, and visuospatial functioning. (*Id.*) Dr. Brawley testified that Petitioner's language functioning, which she rated as average, could "mask" his cognitive defects. (*Id.* at 212–13.) Dr. Brawley explained that frontal lobe damage can produce poor judgment, callousness, impulsivity, an inability to "be able to plan and sequence," and an inability to conform one's conduct to the law or appreciate the wrongfulness of one's actions. (*Id.* at 211.) She concluded that Petitioner had "some form of brain damage," with her "biggest concern" related to frontal lobe functioning, including executive and cognitive functioning. (*Id.* at 219.)

With respect to Petitioner's neuropsychological functioning at the time of the crime, Dr. Brawley expressed "significant concerns," opining that it is "highly likely" that he "could have had them [neurolgical deficits] back in '89 or '90" but also explaining that "we don't know because no one did a neuropsycholgical evaluation on him." (*Id.* at 220.) Citing a number of "red flags," including Petitioner's hand tremor, abnormal CT scan, family history, head injuries, and alcohol abuse, Dr. Brawley testified that she would have recommended that Petitioner be seen by a forensic psychologist and evaluated by a neuropsychologist. (*Id.* at 221.) Dr. Brawley admitted that it would be "conjecture" to conclude that Petitioner was or was not cognitively impaired 20 years ago. (*Id.* at 235.)

Dr. Brawley testified that the Bender-Gestalt test, which Dr. Tatro administered during the Rule 11 exam, is not considered a valid screening test for brain damage. (*Id.* at 197.) She explained that in 1990 the test was used by psychologists but was not routinely used by neuropsychologists, and that the test may still be in use as a "screening test for organicity." (*Id.* at 231.) Dr. Brawley conceded that the mental status examination

1  performed by Dr. Don is used as a screen for neurological dysfunction.  (*Id.*)

2      Dr. Brawley acknowledged that cognition deteriorates over time and that some degree

3  of brain shrinkage is normal as a person ages.  (*Id.* at 233.)  She also testified that Petitioner

4  reported that his memory was slowly getting worse and that he suffered from sleep

5  disturbances and bouts of anxiety, stress, and depression.  (*Id.* at 233-34.)  According to Dr.

6  Brawley, the latter conditions may affect one's cognitive abilities.  (*Id.* at 234.)  She also

7  testified, however, that such conditions "cannot account for the entirety of the deficits" she

8  found in Petitioner.  (*Id.* at 240.)

9      Dr. Thomas Hyde

10      Dr. Hyde, a neurologist and neuroscientist from Maryland, evaluated Petitioner on

11  May 16, 2010, and testified on his behalf.  Dr. Hyde opined to a reasonable degree of medical

12  certainty that Petitioner suffers from multiple neurological deficits and that these deficits

13  existed at the time of the crime.  (RT 10/7/10 at 423; *see* Ex. 10 at 6, 7.)  He based this

14  opinion on the results of the 1987 CT scan, which revealed brain atrophy, and the fact that

15  no "intervening events" had occurred since the time of the crime which would account for

16  the neurological defects revealed in the 2010 examinations.[10]  (*Id.* at 423–25.)  However, he

17  acknowledged that in extreme situations, chronic obstructive pulmonary disease (COPD),

18  anxiety, and sleep disturbance can cause cognitive impairment.  (*Id.* at 436.)

19      Dr. Hyde explained that the behavioral effects of frontal lobe dysfunction include poor

20  reasoning, judgment, and problem-solving.  (*Id.* at 425.)  In his six-page Neurology

21  Consultation Report, Dr. Hyde also noted that individuals with frontal lobe deficits "often

22  behave impulsively and make poor decisions without properly weighing the consequences

23

24      [10]     In support of his contention that frontal lobe damage and cognitive impairment
25  were present at the time of the crime, Dr. Hyde, in his report dated May 10, 2010, cites Dr.
   Brawley's examination of "1996," writing that "Dr. Brawley found other cognitive deficits
26  when testing Roger in 1996" and "previously noted [Petitioner's hand] tremor in 1996." (Ex.
   10 at 6.)  In fact, as Dr. Hyde acknowledged in his testimony, Dr. Brawley did not examine
27  Petitioner until 2006.  (*See* RT 10/7/10 at 405.)

28

of their actions.  Particularly under high levels of stress, they tend to decompensate." (Ex. 10 at 6.)

In his report Dr. Hyde attributes Petitioner's frontal lobe impairment to "developmental abnormalities, the effects of chronic alcohol abuse, and/or the consequences of multiple closed head injuries." (*Id.*) He attributes the brain atrophy seen in two of the CT scans, as well as Petitioner's hand tremor and history of seizures, to chronic alcohol abuse and/or closed head injury. (*Id.* at 6–7)  At the evidentiary hearing, however, Dr. Hyde testified that Dilantin, the medication prescribed to treat Petitioner's seizures in 1988, would only have been prescribed if Petitioner's physician believed Petitioner "was at high risk for recurrent seizures, independent of alcohol withdrawal state." (RT 10/7/10 at 420.)

Dr. Hyde testified that it was "uncommon but not rare" for 11 years to have passed between Petitioner's first reported seizure and his last reported head injury. (*Id.* at 432.) He acknowledged Petitioner has experienced no seizures since his incarceration in 1989, a period during which he has had no access to alcohol. (*Id.* at 433–34.)

Dr. Hyde wrote in his report and testified that Petitioner's neurological deficits would have had a "significant impact upon Roger's behavior at the time of the alleged offense." (Ex. 10 at 7; *see* RT 10/7/10 at 425.)  He explained that crimes committed by individuals with frontal lobe impairment are often "impulsive" and consist of "poorly thought out behaviors." (RT 10/7/10 at 437.)  He testified that Petitioner's post-crime behavior, which included attempts to conceal evidence and fabricate an alibi, were not inconsistent with a diagnosis of frontal lobe injury because his attempts to hide Styers' shoes and gun were not well thought out. (*Id.* at 425–26.)  He conceded, however, that he had not reviewed the police reports, the trial transcripts, Petitioner's confession, or any of the court decisions setting forth the facts of the crime; his only information about the crime came from "a very brief outline from Mr. Scott and his attorney. (*Id.* at 436–37.)  Therefore, Dr. Hyde was not familiar with aspects of Petitioner's conduct—such as planning the murder for a week,

negotiating a price for his participation, and scouting locations where the murder could take place unobserved—that are more consistent with planning and forethought rather than with the kind of impulsivity associated with frontal lobe damage. (*Id.* at 436–77, 440–41.) Dr. Hyde also agreed that being interrogated by detectives and subjected to cross-examination are stressful events which might cause an individual with deficits in executive functioning to decompensate. (*Id.* at 439–40.)

Dr. Hyde testified that he was opposed to the death penalty on moral and religious grounds. (*Id.* at 401.) He had never been asked by a prosecuting agency to evaluate a capital defendant and would not do so unless the death penalty were removed as a possible sentence. (*Id.* at 400–01.) He testified that these opinions did not affect his ability provide an unbiased, scientific evaluation. (*Id.* at 401.)

Dr. James Seward

Dr. Seward, a forensic psychologist and neuropsychologist, testified for Respondents. Dr. Seward conducted a clinical interview, administered a battery of neuropsychological tests, and wrote a 28-page report detailing his examination and diagnoses. (Ex. 205; *see* RT 10/6/10 at 255.) He concluded that Petitioner was presently cognitively impaired, with "mild to severe impairments in some aspects of executive functioning." (Ex. 205 at 23; RT 10/6/10 at 255–56.)

Dr. Seward testified that Petitioner "probably" did not suffer from cognitive impairment at the time of the crime and trial. (RT 10/6/10 at 268; *see* Ex. 205 at 23.) His opinion was based on two considerations. First, contemporaneous test results, including the exams by Drs. Don and Tatro, as well as Dr. DiBacco's 1996 report, did not support a finding that Petitioner had such defects, despite the fact that "any cognitive impairment would have been relevant to the issues they were examining at that time." (*Id.*; Ex. 205 at 23–24.) In the 1980s Petitioner was hospitalized for seizures, possibly caused by alcohol abuse. In Dr. Seward's opinion, if neurological deficits had been present at that time, they would have

been noted by the doctors who treated Petitioner. (*Id.* at 354.) Dr. Seward also stated that Petitioner's current defects could be the product of intervening events, including depression, sleep disturbances, chronic pain, and COPD, conditions documented in his prison medical records. (*Id.* at 253, 266–67, 269; Ex. 205 at 24–25.) He also noted that the decline in Petitioner's IQ supports the theory that his neurological condition has deteriorated from the time of crime.[11] (*Id.* at 267.)

Next, Dr. Seward explained that the circumstances of the crime, including Petitioner's conduct before and after the murder, was atypical of offenses committed by individuals with executive dysfunction related to frontal lobe damage. He concluded, therefore, that Petitioner's criminal behavior was not influenced by cognitive impairment. (*Id.* at 269.) Dr. Seward explained that "people with deficits in executive functioning are impulsive," "have difficulty planning," and "perhaps have explosive outbursts." (*Id.* at 269.) Dr. Seward noted that the murder was planned beforehand to minimize the risk of being observed by witnesses and that Petitioner exhibited "flexible thinking" in his attempts to conceal evidence and concoct an alibi. (*Id.* at 270–272; *see* Ex. 205 at 26–27.) Dr. Seward also noted that Petitioner did not decompensate during his lengthy interrogations or during cross-examination at trial, nor did he appear suggestible, compliant, or passive. (*Id.* at 271–72, 344–45; Ex. 205 at 26–27.)

In his report Dr. Seward stated that Petitioner's "behavior before, during, and after the crime reflected the presence of maladaptive personality traits" such as a lack of remorse. (Ex. 205 at 27.) According to Dr. Seward, while "poor judgment and irresponsibility are associated with disorders in executive functioning," they are also consistent with an antisocial personality disorder. (*Id.*; *see* 10/6/10 at 10 at 345.)

In contrast to Dr. Brawley's testimony, Dr. Seward testified that in 1990 the Bender-

---

[11]     Dr. Seward determined that Petitioner's full scale IQ was 80. (RT 10/6/10 at 254; Ex. 205 at 19). In 2006, Petitioner's IQ was 88; in 1996, 89.

1    Gestalt test was commonly used to screen for neurological dysfunction.  (*Id.* at 261.)

2        Dr. Harry Tamm

3        Dr. Tamm, a Phoenix neurologist who read Petitioner's 1987 CT scan, testified for

4    Respondents.  Dr. Tamm has consulted and testified for both the defense and the prosecution.

5    (RT 10/7/10 at 447.)  Like Dr. Hyde, Dr. Tamm is not in favor of the death penalty.  (*Id.* at

6    487.)

7        Dr. Tamm testified that a CT scan taken in 1985 was normal; that EEG scans from

8    1987 and 1988 were normal; that the CT scan from 1987 was suggestive of "slight" or "mild"

9    brain atrophy; and that the CT scan from 1988 showed no changes from the 1987 scan.[12]  (*Id.*

10   at 450–53.)  Dr. Tamm opined that the atrophy was likely the product of alcohol abuse.  (*Id.*

11   at 454, 459.)  He also explained that an abnormal CT scan does not equate to abnormal

12   functioning; it is possible to have an abnormal CT scan but completely normal neurological

13   functioning (*id.*), just as it is possible to have brain atrophy and no neurological dysfunction,

14   cognitive impairments, or deficits in executive functioning (*id.* at 455).

15       Dr. Tamm testified that the CT scans and EEGs performed in 1987 and 1988 do not,

16   to a reasonable degree of medical certainty, indicate neurological dysfunction, cognitive

17   impairment, or deficits in executive functioning.  (*Id.* at 455–56.)  He further opined that it

18   was not possible, based on the 2006 and 2010 test results, to determine whether Petitioner

19   had neurological defects 20 years ago, or what effect they may have had on his conduct at

20   the time of the crime.  (*Id.* at 466–69.)  Any attempt to render such an opinion would be

21   speculative.  (*Id.* at 469.)

22       With respect to Petitioner's head injuries, Dr. Tamm noted that the only incident

23   supported by medical records occurred in 1961; concerning that incident there was "no

24   mention of a brain injury, or of a concussion, or of the clinical circumstances which

25

26   _____

27       [12]    Dr. Tamm explained that a CT scan illustrates the "structure of the brain" while
     an EEG addresses "function or physiology."  (RT 10/7/10 at 449.)

28

surrounded the one observation that was objective and documented, and that was a little bit of swelling in the scalp." (*Id.* at 456-67.) With respect to Petitioner's seizures, Dr. Tamm noted that the first event occurred 11 years after Petitioner's last (self-reported) head injury; therefore, an association between the injuries and the seizures, while not impossible, is "less likely." (*Id.* at 457.) Also, according to Dr. Tamm, the existence of two normal EEGs is more consistent with alcohol abuse, rather than significant head injuries, as the cause of the seizures. (*Id.* at 458.) However, Dr. Tamm could not offer a conclusive opinion as to the cause of the seizures. (*Id.* at 459.)

With respect to Petitioner's hand tremor, Dr. Tamm testified that head injuries generally don't cause such a condition. (*Id.* at 461.) He further explained that alcohol abuse can cause both brain atrophy and tremors. (*Id.* at 464.) He also noted that the tremor appears to have worsened over time. (*Id.*) Dr. Tamm testified that the presence of a hand tremor does not indicate cognitive impairment. (*Id.* at 470–71.)

Dr. Tamm testified that several intervening events, including depression, chronic pain, and sleep deprivation, may have affected Petitioner's recent test behavior. (*Id.* at 466.)

Finally, Dr. Tamm testified that notwithstanding the abnormal CT scan results, he likely would not have recommended neuro-psychometric testing in 1991, absent additional information. (*Id.* at 480–81.)

<u>Analysis</u>

The right to effective assistance of counsel applies "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)). In assessing whether counsel's performance was deficient under *Strickland*, the test is whether his actions were objectively reasonable at the time they were taken. *Strickland*, 466 U.S. at 689–90. The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as

- 29 -

the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687); *see Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998) ("the relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable").  The *Strickland* Court elaborated that:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91.  In *Wiggins v. Smith*, 539 U.S. 510, 533 (2003), the Court reiterated that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant . . . [or even to] present mitigating evidence at sentencing in every case."

With respect to prejudice from counsel's performance at sentencing, the *Strickland* Court held that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695.  It is the defendant's burden to "affirmatively prove prejudice." *Id.* at 693; *see Belmontes*, 130 S. Ct. at 390–91 ("*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different."). In meeting this burden "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*.

To assess prejudice, a reviewing court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.  The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in

- 30 -

the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

In its remand order the Court of Appeals offered the following characterization of Petitioner's claim that counsel performed ineffectively at sentencing:

> The record reflects Steinle, the State, and the trial judge all knew Scott claimed he had "brain shrinkage" caused by several traumatic brain injuries, including a bicycle accident in seventh grade with a car, two motorcycle accidents, and a car accident, all of which had rendered Scott temporarily unconscious. In fact, Steinle had used Scott's claim of brain shrinkage as grounds for requesting a pre-trial competency evaluation ordered by the court. There is no evidence, however, Steinle independently investigated these claims to present them as mitigating evidence in the penalty phase of the trial.
>
> . . . .
>
> As indicated by the 2006 report ordered by Scott's federal habeas attorneys, investigation would have revealed a computer tomography ("CT") scan demonstrating Scott had organic brain damage. Scott's organic brain injury is also described in a psychiatric evaluation ordered by his federal habeas attorneys in 1996. The report states a CT scan performed in 1987 showed the presence of brain atrophy unusual for a person of Scott's age at the time, and Dr. Don, the psychiatrist, linked this brain damage to a likelihood that Scott was more easily influenced by Styers than would have been a normal person.
>
> Additionally, for several years Scott was a severe alcoholic, drinking two fifths of whiskey every day—which may also have contributed to cognitive problems. . . . Certainly Scott's traumatic head injuries should have been, at the very least, investigated by Steinle in preparation for the presentation of Scott's penalty-phase case by ordering the same hospital records relied upon by the 2006 report. Such an omission by Steinle is striking.

*Scott*, 567 F.3d at 583–85.

Respondents note, and Petitioner concedes, that this passage contains several factual inaccuracies. The 1996 report was prepared by Dr. DiBacco, not Dr. Don; it contains no reference to the 1987 CT scan; and it does not find that Petitioner suffered from organic brain injury or brain atrophy—in fact, as previously recounted, Dr. DiBacco found "no discernible cognitive deficiencies" but diagnosed Petitioner with a personality disorder. (Ex. 16 at 5.) Neither the 1996 report nor the 2006 report was prepared by Dr. Don. Finally, neither Dr. Don's report, Dr. DiBacco's 1996 report, nor Dr. Brawley's 2006 report "linked [any] brain

- 31 -

damage to a likelihood that Scott was more easily influenced by Styers than would have been a normal person." *Id.* at 583–84. Indeed, the only expert to opine that Petitioner's mental condition rendered him susceptible to manipulation by Styers was Dr. Tatro, whose findings, as set forth in his Rule 11 report and trial testimony, Steinle placed before the sentencing judge and relied on in his successful argument that Petitioner's psychological characteristics constituted a mitigating circumstance.

The record also reveals that the evidence concerning Petitioner's reported head injuries is far more ambiguous than the characterization offered by the Ninth Circuit. Apart from reports from the 1961 accident, which described among other injuries a hematoma on Petitioner's forehead, no contemporaneous medical records document any other accidents or head injuries.

### 1.   *Deficiency prong*

Both attorney Gorman and Russell Stetler, the FPD mitigation coordinator, testified about the prevailing standard of care regarding mitigation in capital cases at the time of Petitioner's trial and opined that Steinle's performance did not conform to that standard. (*See* RT 10/5/10 at 154.) Stetler testified that under prevailing contemporary standards, as set forth in the 1989 ABA guidelines and various professional publications, Steinle should have retained a mitigation specialist to gather documentary evidence and prepare a social history, which would have provided a framework for additional mental health investigation. (*Id.* at 135–36.) According to Stetler, a competent mitigation investigation would have addressed the issue of traumatic brain injury and other neurological deficits. (*Id.* at 135.) Specifically, prevailing standards would have dictated that counsel undertake further investigation into Petitioner's neurological status based on suggestions in the record that he had a history of seizures and had been involved in several accidents. (*Id.* at 139.)

Steinle, who had tried two or three other capital cases at the time of Petitioner's trial, also testified about the standard of care in capital cases in Arizona at the time. He stated that

from 1986, when he joined the Maricopa County Public Defender's Office, to 1991, the common practice in capital sentencing proceedings was to retain a particular expert to perform a mental health examination and to submit a brief sentencing memorandum. (RT 10/6/10 at 278–79.)  When he began handling capital cases, Steinle "started from scratch," reviewing every Arizona capital case and drafting a more detailed sentencing memorandum which he refined in subsequent cases. (*Id.* at 279.)

Steinle testified that within the public defender's office "mitigation was not a huge priority" because a consensus existed that Arizona's capital punishment scheme, with its judge-only sentencing, would be found unconstitutional. (*Id.*)  He further testified that at the time of Petitioner's trial there was no training available in the area of capital sentencing. (*Id.*)  Steinle indicated that he initiated the practice of using co-counsel in capital cases, and in Petitioner's case he worked with Bill Foreman. (*Id.*)

Steinle testified that he did not retain a mitigation specialist, and in fact had never heard the term at the time of Petitioner's trial. (*Id.* at 280–81.)  He indicated, however, that it was his practice in capital cases to retain an investigator who would gather information for the sentencing phase of trial, and he believed he followed that practice in Petitioner's trial. (*Id.* at 281.)

Steinle testified that his primary goal in Petitioner's case was to avoid the death sentence by securing a plea agreement, which he achieved when the prosecutor offered a plea deal for second-degree murder.  The agreement required Petitioner to testify truthfully about the murder conspiracy. (*Id.* at 283; *see* Ex. 39 at 1; Ex. 48.)  Steinle and Foreman presented the agreement to Petitioner, attempted to explain it, and advised Petitioner to accept the offer. (*Id.*; Ex. 39 at 1–2.)  Petitioner initially indicated that he would sign the agreement but he refused to read it, stating that he had a headache and needed his medication. (*Id.*)  He also maintained that he was innocent of the crime and did not know that Styers was going to kill the child. (*Id.* at 283–84; Ex. 39 at 2.)  Ultimately, Steinle and co-counsel were unsuccessful

in obtaining Petitioner's consent to the plea deal and the State withdrew the offer.[13]  (*Id.*; Ex. 39 at 2.)

According to Steinle, it was during this period Petitioner also complained of memory problems and told Steinle that he had brain shrinkage as a result of an auto accident. (*Id.* at 285.) Steinle moved for the Rule 11 evaluation, although he observed no signs of memory problems or cognitive impairment on Petitioner's part. (*Id.* at 285–86.) Steinle chose Dr. Tatro to perform the examination because he had used him in previous cases and believed his report would be thorough.[14] (*Id.* at 288–89.) According to Steinle, in his reports Dr. Tatro "went through complete family histories" and "talked about the inner dynamics of what he saw." (*Id.* at 289.) Steinle also testified that he was aware of another case in which the Arizona Supreme Court reversed a death sentence based in part on a report prepared by Dr. Tatro.[15] (*Id.* at 288.) Steinle believed that Dr. Tatro would have asked for additional records if he needed them for his evaluation. (*Id.* at 295.)

Steinle confirmed the limited scope of his mitigation investigation. He acknowledged that he did not obtain Petitioner's medical or school records and did not retain a neuropsychologist or other mental health expert beyond Dr. Tatro. (*Id.* at 316–17, 323.) At the presentence hearing Steinle called no witnesses but submitted Dr. Tatro's Rule 11 report, a letter from the Maricopa County Sheriff's Office stating that Petitioner had no disciplinary record, and letters to Petitioner from his mother and from a woman named Jane Dollahan. (Ex's 41–44.) He also submitted a life history, which he had Petitioner prepare. (Ex. 45.) In this document Petitioner discussed his family background, employment history, and

---

[13]    Steinle did not submit the plea offer as mitigating evidence at sentencing because he did not believe it was permissible, as the agreement was never entered. (RT 10/6/10 at 317–18.)

[14]    *See State v. Stuard*, 176 Ariz. 589, 863 P.2d 881 (1993); *State v. Lavers*, 168 Ariz. 376, 814 P.2d 333 (1991).

[15]    *State v. Stevens*, 158 Ariz. 595, 764 P.2d 724 (1988).

- 34 -

physical ailments.  (*Id.*)  He also described the accident he was involved in at age 13 and mentioned a second accident, in 1974, when he wrecked his motorcycle and injured his back and neck.  (*Id.* at 2, 4.)

Steinle testified that in preparing for the sentencing stage of trial he took into account the fact that the trial judge, rather than a jury, would act as sentencer.  (RT 10/6/10 at 298.) He believed that citation to case law would be persuasive and that the judge would consider all of the information contained in the Tatro and Don reports, which mentioned Petitioner's head injuries as well as Dr. Tatro's diagnosis of personality disorder.  (*Id.* at 297–98.)  He explained that he did not call witnesses because the State did not contest the proffered mitigating circumstances.  (*Id.* at 299.)  Similarly, he did not obtain Petitioner's medical records because no one contested the reported head injuries.  (*Id.* at 300.)

Steinle testified that his strategy was to pursue what he believed was the strongest, most consistent theory at both the guilt and sentencing stages.  (*Id.* at 287, 294, 298.)  He testified that the diagnosis arrived at by Dr. Tatro—that Petitioner suffered from a personality disorder that rendered him susceptible to manipulation by Styers—provided a more convincing explanation of Petitioner's involvement in the crime than the theory that he suffered from frontal lobe damage that caused him to act impulsively.  (*Id.* at 294–95.) Steinle explained that in his view this conclusion was supported by the facts of the crime. (*Id.* at 295–96.)  While Petitioner was not the shooter, he agreed to go along with Styers' plan to kill the child, a circumstance which Dr. Tatro's diagnosis "specifically captured." (*Id.* at 297.)  Steinle explained that Dr. Tatro's description of Petitioner's personality, that "he had a hard time making decisions and say[ing] no and he just wanted to please everybody, fit the picture of both what he said and told the police officers, and also what he told us." (*Id.* at 295.)  Steinle testified that Dr. Tatro's theory "captured the totality of what I wanted to communicate to the trial court, and if not the trial court, based upon those cases, apparently the [Arizona] Supreme Court seemed to feel Dr. Tatro was credible and made them capture

- 35 -

1    their attention." (*Id.* at 297.)

2         Steinle contrasted the facts of Petitioner's case with those of *State v. Stuard*, 176

3    Ariz. 589, 863 P.2d 881 (1993), a matter in which he represented a capital defendant whose

4    death sentences were overturned by the Arizona Supreme Court. In *Stuard* the defendant was

5    a 53-year-old former boxer who committed a series of sexual assaults and murders of elderly

6    women.   Steinle retained Dr. Tatro, who determined that the defendant had a serious

7    personality disorder and likely suffered from sustained organic brain damage as a result of

8    his boxing career—a finding Dr. Tatro reached after administering the Bender Visual-Motor

9    Gestalt Test. *Id.* at 606, 863 P.2d at 898.  To follow up on Dr. Tatro's diagnoses, Steinle had

10   the defendant examined by a neuropsychologist, who confirmed that the defendant suffered

11   from brain dysfunction.   *Id.* at 606–07, 863 P.2d at 898–99.   Based on the nature of the

12   crimes and the diagnoses reached by Dr. Tatro and other experts, Steinle presented a

13   mitigation theory based on brain damage and lack of impulse control. (RT 10/6/10 at 292.)

14        Dr. Tatro did not make such a finding with respect to Petitioner, nor did he

15   recommend neuropsychological testing.  Moreover, the facts of the crime, unlike those in

16   *Stuard*, did not support a mitigation argument based on brain damage and impulsivity. (*Id.*

17   at 295–96.) Steinle reiterated that the theory he presented at sentencing, based on Dr. Tatro's

18   findings, was accepted by the trial judge, who ruled that a mitigating circumstance had been

19   proved based on Petitioner's psychological characteristics and their nexus to the crime. (*Id.*

20   at 301–02, 339.)

21        Steinle chose not to argue alternative mitigation theories—that Petitioner suffered

22   from head injuries as well as a personality disorder—because he wanted to focus on what he

23   believed was the strongest argument and because information concerning Petitioner's

24   reported head injuries was already part of the record. (*Id.* at 297–98.)

25        Based on this record, and applying the deferential standard mandated by *Strickland*,

26   the Court finds that Steinle's performance was not deficient.   Steinle did not ignore

27

28                                          - 36 -

Petitioner's reported brain shrinkage.  He moved for a Rule 11 examination specifically on that basis.  Two experts, tasked with determining Petitioner's competency to stand trial and his state of mind at the time of the offense, examined Petitioner and found that he did not have brain damage or cognitive deficiencies.  One of these experts, Dr. Don, was a psychiatrist and Diplomate on the American Board of Psychiatry and Neurology.  (Ex. 11.) *Cf. Summerlin v. Schriro*, 427 F.3d 623, 642 (9th Cir. 2005) (criticizing counsel's reliance on opinion of Dr. Tatro, a "psychologist, not a psychiatrist or neurologist," whose report addressed only defendant's competence to stand trial and the viability of an insanity defense).

It was reasonable for Steinle to rely on these opinions and to formulate his mitigation arguments accordingly.  As the Ninth Circuit explained recently, "When there is no 'objective indication' that a defendant has a mental illness or brain damage, we cannot label counsel 'ineffective for failing to pursue this avenue of mitigation.'"  *Earp v. Cullen*, 623 F.3d 1065, 1076 (9th Cir. 2010) (quoting *Gonzalez v. Knowles,* 515 F.3d 1006, 1015 (9th Cir. 2008)). This is true notwithstanding any criticism of the methodologies employed by Drs. Tatro and Don.  *Id.* ("Even if the mental health professionals who evaluated Earp at the time of his trial incorrectly concluded that Earp did not have organic brain damage, Earp's claim fails.  An expert's failure to diagnose a mental condition does not constitute ineffective assistance of *counsel*, and Earp has no constitutional guarantee of effective assistance of experts."); *see Babbitt*, 151 F.3d at 1174 (rejecting argument that counsel performed ineffectively because his expert was not qualified to make a diagnosis, finding "there is no duty to ensure the trustworthiness of the expert's conclusions"); *Campbell v. Coyle*, 260 F.3d 531, 555-56 (6th Cir. 2001) (no deficient performance where it was "objectively reasonable" for counsel to rely on expert's finding that defendant did not suffer from PTSD).  The present diagnoses offered by Drs. Brawley, Seward, and Hyde do not undermine the reasonableness of Steinle's performance 20 years ago.  *Id.* ("The fact that Earp can now present a neuropsychologist who is willing to opine that he had organic brain damage at the time of his trial does not impact

the ultimate determination of whether Earp's trial counsel insufficiently investigated that possibility.").

The reasonableness of Steinle's performance at sentencing is further supported by the strategic choices he made in presenting a mitigation theory. These choices were made in response to the facts of the case and the diagnosis provided by Dr. Tatro. While Steinle had previously used brain damage and impulsivity as a mitigating circumstance, he did not believe such a theory, had it been confirmed by expert opinion, fit the facts of Petitioner's case. Under these circumstances, arguing that Petitioner suffered from brain injury and cognitive deficits might have "appear[ed] to be a 'flight into theory' without proper grounding in the facts of the case." *Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007); *see Phillips v. Bradshaw*, 607 F.3d 199, 217 (6th Cir. 2010) (omitted mitigating evidence "would not have fit neatly into counsel's chosen mitigation theory, and a different approach would have been required if the totality of the mitigating evidence were to be presented"). On the other hand, Dr. Tatro's theory, that Petitioner suffered from a personality disorder which made him vulnerable to manipulation by his co-defendant, did have explanatory value with respect to Petitioner's participation in the conspiracy and murder.

There is no doubt that Steinle's investigation into mitigating circumstances was less than complete. He could have followed up on information concerning Petitioner's brain atrophy.[16] However, nothing in the Rule 11 reports suggested that Petitioner suffered from organic brain damage, cognitive deficits, or problems with impulse control, and Dr. Tatro's report, finding that Petitioner suffered from a personality disorder that explained his participation in the offense, provided a clear, consistent, and coherent theory which applied both to the guilt and penalty phases of trial. Therefore, Steinle's "strategic choices,"

---

[16] However, as discussed below, even if Steinle did obtain the CT scans and EEGs, the import of those tests was and is a matter of dispute, with one of the physicians who ordered and reviewed the scans testifying that the results, while they showed mild brain atrophy, were not determinative of the presence of cognitive deficits.

although "made after less than complete investigation," *Strickland*, 466 U.S. at 690–91, were reasonable because they were supported by his professional judgment that Dr. Tatro's diagnosis provided the strongest available mitigation theory.

>    2.    *Prejudice*

To determine whether Petitioner was prejudiced by counsel's performance at sentencing, the Court must weigh the totality of the mitigating evidence, including the new evidence introduced during the habeas proceedings.  *Wiggins*, 539 U.S. at 536.  As noted above, at the evidentiary hearing Drs. Brawley, Seward, Hyde, and Tamm testified about Petitioner's neurological condition.  Their testimony addressed the possibility that Petitioner suffers from brain damage and the effects such a condition may have had on his conduct at the time of the crime.  Broadly speaking, the experts agree that Petitioner presently suffers from neurological deficits.   They differ, however, as to whether these deficits were present two decades ago when the crime was committed.   Because there is no substantial disagreement about Petitioner's present condition, and because a claim of ineffective assistance requires the Court to "reconstruct the circumstances" of Steinle's performance and "evaluate it from his perspective at the time," *Strickland*, 466 U.S. at 689, the Court will focus on the evidence concerning Petitioner's condition at the time of his trial.

In 1990–91 medical records would have shown, if Steinle had procured them, that Petitioner was injured in a car accident in 1961, when he was 13, and that in the mid to late 1980s, while being treated for seizures, he received a series of CT scans (the first of which was normal, the next two showing slight but abnormal brain atrophy) and EEGs (which showed normal functioning).  While Steinle did not obtain these records, he was aware, through the reports of Drs. Don and Tatro, that Petitioner reported being injured in several other car accidents, some of which led to unconsciousness.  However, no medical records were available to documents these incidents.

Based on its review of this information, considered in the light of the new evidence

1   concerning Petitioner's current neurological status, the Court concludes that Petitioner has

2   not met his burden of proving that he was prejudiced by Steinle's performance at sentencing.

3   This conclusion is based on two factors.   First, Petitioner has not established that the

4   cognitive deficits he currently suffers from were present at the time of the crime.   Second,

5   assuming evidence existed at the time to support a finding that Petitioner suffered from such

6   defects, Petitioner has not established that a mitigation case based on that evidence would

7   have been more persuasive than the theory Steinle did present at sentencing.

8          While the experts agree that Petitioner presently suffers from neurological deficits,

9   there is no consensus as to whether these deficits were present at the time of the crime.   Only

10  Dr. Hyde opined to a reasonable degree of medical certainty that the defects existed 20 years

11  ago.   (RT 10/7/10 at 423.)   Dr. Brawley thought it likely that the defects were present (RT

12  10/6/10 at 220, 235), while Dr. Seward believed they probably were not (*id.* at 268).   Dr.

13  Tamm testified that it would be speculation to offer an opinion.   (RT 10/7/10 at 466–69).

14         Along with this lack of consensus among the experts who have recently examined

15  Petitioner, several other factors cast doubt on the argument that Petitioner's present

16  neurological deficits are reflective of his condition 20 years ago.   It was not until Dr.

17  Brawley's examination in 2006 that any expert opined that Petitioner suffered from cognitive

18  deficits.   As previously detailed, prior to Petitioner's trial Drs. Don and Tatro found that he

19  did not suffer from brain damage.   Likewise Dr. DiBacco, examining Petitioner in 1996,

20  found "no discernible cognitive deficiencies," instead diagnosing Petitioner with a

21  personality disorder.   (Ex. 16 at 5.)

22         Petitioner's head injuries are all self-reported, with the exception of the hematoma on

23  his forehead resulting from the 1961 accident.   Thus, while Petitioner has indicated that he

24  was involved in motor vehicle accidents and suffered unconsciousness several times in the

25  1970s, no contemporaneous medical records document these events and there is no evidence

26  that he was ever examined by a neurologist as a result of his injuries.   (*See* RT 10/6/10 at

27

28

228, 259–60; RT 10/7/10 at 418, 431, 456.) Moreover, Petitioner's reports of his injuries are inconsistent; on some occasions, including in his life history and during his evaluation by Dr. Tatro, he recounted fewer accidents and described only injuries to his back, arm, or neck. (*See* Ex's 13, 45.)

The only evidence consistent with the presence of cognitive impairment at the time of the crime and Petitioner's trial is the mild brain atrophy seen in the 1987 and 1988 CT scans and the seizures and hand tremor Petitioner experienced. The experts testified, however, that there is no necessary correlation between these conditions and cognitive defects. (*See* RT 10/6/10 at 232; 10/7/10 at 455.) The experts also agreed that alcohol abuse, alone or in combination with head injuries, could account for Petitioner's brain atrophy as well as his seizures and tremors. (*See* RT 10/7/10 at 411, 419, 432–34, 454, 458–61.) Medical reports from 1985, 1987, and 1988 cited alcohol abuse as the cause of the seizures, and he has experienced no seizures since his incarceration. (*See* RT 10/6/10 at 260, 433–34; Ex's 18, 20.)

Furthermore, notwithstanding Dr. Hyde's testimony to the contrary (*see* RT 10/7/10 at 423–25), the record indicates that Petitioner has experienced several intervening events—including COPD, chronic pain, sleep disturbances, and depression—that could account for his performance on recent neurological tests (*see* RT 10/6/10 at 233–34, 253, 266–67, 269). The passage of time and the deterioration of Petitioner's condition undermines any contention that his neurological status in 1989 can be reconstructed accurately based on current test results.

Finally, as discussed in more detail below, the nature of Petitioner's conduct before and after the crime is not consistent with the impulsivity associated with cognitive impairment due to frontal lobe damage.

The equivocal nature of the evidence concerning Petitioner's neurological or cognitive status 20 years ago is the first factor the Court considers in its evaluation of the central

question: whether there is a reasonable probability that Petitioner would not have been sentenced to death if Steinle had investigated and presented mitigating evidence of Petitioner's "traumatic brain injuries and their effect on his mental processes." *Scott*, 567 F.3d at 586.  Petitioner contends that a mitigation argument based on brain damage would have been more effective and if such evidence had been presented there was a reasonable probability of a different verdict.  The Court disagrees.

As noted above, in remanding this claim the Ninth Circuit emphasized Steinle's omission of mitigating evidence that "linked [any] brain damage to a likelihood that Scott was more easily influenced by Styers than would have been a normal person." *Id.* at 583–84. Steinle's mitigation argument, however, did feature a linkage between Petitioner's mental condition and the crime.  Dr. Tatro diagnosed Petitioner with a personality disorder; the features of that disorder, including passivity and submissiveness, allowed Petitioner to become the "dupe" and "unwitting accomplice" of Styers.  (Ex. 13 at 15.)  Steinle offered this evidence at sentencing and the trial court found that Petitioner's psychological characteristics constituted a mitigating circumstance, particularly because they were causally related to his participation in the crime.  (Ex. 2 at 15.)

By contrast, Petitioner has yet to establish a connection between brain injury and his participation in the conspiracy and murder.  Testimony from the evidentiary hearing indicated that frontal lobe damage and the resulting cognitive impairment are associated with impulsive action taken without regard for consequences.  The theory that Petitioner was brain damaged and cognitively impaired would not have fit the facts of the crime.  It also would have been inconsistent with Petitioner's defense at the guilt stage of trial and with the mitigation case Steinle did present, both of which were based on Dr. Tatro's diagnosis of a personality disorder.

Petitioner negotiated a price for his involvement in the crime, eventually agreeing to take part for a payment of $250.  (Ex. 35 at 10.)  He scouted locations for the murder,

rejecting some because they were too heavily trafficked. (*Id.* at 12–13.)  He discussed and planned the murder with his co-defendants for a week. (*Id.* at 12.)  He attempted to conceal evidence of the crime and fabricated an alibi to deflect suspicion. (*Id.* at 22–24.)  These activities all reflect rational deliberation rather than impulsivity and a failure to appreciate consequences.   Similarly, while individuals with frontal lobe damage are likely to decompensate when faced with stressful situations, Petitioner maintained his composure under interrogation by detectives and during cross-examination by the prosecutor.

Therefore, even assuming Petitioner suffered from neurological defects at the crime, the theory presented by Steinle through Dr. Tatro's diagnosis provided a more convincing explanation for his participation in the crime. *Cf. Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005) (noting that "explanatory" mitigating evidence often bears more weight than "humanizing" evidence).  If Steinle had argued that Petitioner was brain damaged and suffered from cognitive deficiencies, Dr. Tatro's opinion would have been displaced and Steinle would have been unable to offer a plausible explanation for Petitioner's active participation in the murder conspiracy and its aftermath. *See Cannon v. Gibson*, 259 F.3d 1253, 1277–78 (10th Cir. 2001) (omitted mitigation information of "serious brain damage" and lack of impulse control would have displaced mitigation information portraying the petitioner as a "kind, compliant, and responsible individual whose involvement in the murder was an aberration").

Petitioner cites *State v. Walton*, 159 Ariz. 571, 588, 769 P.2d 1017, 1034 (1989), for the proposition that organic brain damage outweighs personality disorder as a mitigating circumstance.  In Petitioner's case, however, the theoretical advantage of brain damage as mitigation is offset by its lack of support in the record, including the reports of Drs. Tatro and Don, and the nature of Petitioner's criminal conduct.  In *State v. Speer*, 221 Ariz. 449, 465, 212 P.3d 787, 803 (2009), the Arizona Supreme Court, faced with conflicting expert testimony about the defendant's alleged cognitive deficits, explained: "We do not conclude

that Speer proved significant cognitive impairment.  Whatever the formal diagnosis of Speer's mental health, the record makes plain that he had a clear ability to think ahead and understand the wrongfulness of his actions."  Similarly, whether Petitioner had a personality disorder or suffered from the effects of traumatic brain injury, his participation in the conspiracy and murder was calculated and purposeful.  The record belies any assertion that Petitioner acted impulsively or was unaware of the consequences of his actions.  Therefore, the mitigating value of any evidence about Petitioner's cognitive capacities was necessarily limited.  *See State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997) ("the weight to be given mental impairment should be proportional to a defendant's ability to conform or appreciate the wrongfulness of his conduct.").

The trial court found that Petitioner's psychological characteristics were related to the crime and constituted a mitigating circumstance.  It would be speculation to conclude that the trial judge would have made a similar finding if Steinle had argued that Petitioner suffered from neurological deficits rather than a personality disorder.  Conjecture of this kind would be particularly unwarranted here because the presence of cognitive deficits and frontal lobe damage was not consistent with the facts of the crime and did less to explain Petitioner's conduct than the theory Steinle presented at sentencing.  In any event, speculation is not sufficient to establish a reasonable probability of a different outcome.  *See Gonzales*, 515 F.3d at 1016; *Murphy v. Ohio*, 551 F.3d 485, 496 (6th Cir. 2009) ("there is an insufficient showing of prejudice where one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different") (interior quotations omitted).

The quality of the mitigating evidence at issue distinguishes Petitioner's case from those in which counsel's performance resulted in prejudice at sentencing.  In *Stankewitz v. Woodford*, 365 F.3d 706, 718 (9th Cir. 2004), for example, all of the defendant's experts agreed that he was significantly brain damaged as a result of fetal alcohol syndrome or childhood abuse; from early childhood he had a documented record of "psychotic thinking"

and "sudden loss of control."  In *Pinholster v. Ayers*, 590 F.3d 651, 675-77 (9th Cir. 2009) (en banc), counsel failed to present evidence that the defendant suffered frontal lobe damage from two car accidents when he was a child.  The brain damage manifested itself in epileptic seizures that began soon after the accidents and was documented in abnormal EEGs taken at the time.  *Id.*  Experts further concluded that the frontal lobe damage had changed the defendant's personality and "explained his aggressive, violent, and antisocial behavior."  *Id.* 676.  Discussing the prejudicial effect of the omission of such evidence, the Ninth Circuit noted that the defendant's "brain damage may have influenced, or even caused, his behavior at the time of the crime."  *Id.*  The only mitigating evidence introduced by defense counsel was unsupported and inaccurate testimony from the defendant's mother concerning the car accidents and the onset of the child's epilepsy.  *Id.*  In *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005), the Ninth Circuit ruled that the defendant was prejudiced at sentencing by counsel's failure to present available expert evidence that he suffered from psychomotor epilepsy and was experiencing a psychomotor seizure when he committed the crime.  The court found that the seizure would have "strongly affected Summerlin's ability to control his actions."  *Id.*

In *Porter v. McCollum*, 130 S. Ct. 447, 449–50 (per curiam) (2009), the Supreme Court found ineffective assistance where counsel failed to present evidence of the defendant's violent and abusive childhood, his record as a decorated Korean War veteran, and the traumatic effects of his service.  During postconviction proceedings Porter also presented evidence from an expert in neuropsychology who found that he "suffered from brain damage that could manifest in impulsive, violent behavior" and that "[a]t the time of the crime . . . Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance," both of which constituted statutory mitigating circumstances under state law.  *Id.* at 451.  The expert also determined that Porter suffered from cognitive defects at the time of trial.  *Id.*

In each of these cases trial counsel failed to present mitigating evidence that the defendant suffered from brain damage at the time of his crime and that the damage contributed to his criminal conduct by causing him to lose control and act impulsively. Again, in contrast to these defendants, and unlike the defendant Steinle represented in *Stuard*,[17] neither contemporary mental health evaluations and records nor the facts of the crime suggested that Petitioner suffered from brain damage or cognitive dysfunction that were in any way related to his role in the conspiracy and murder.

Summary

*Strickland* cautioned that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." 466 U.S. at 689. This Court, assessing Steinle's performance from his perspective at the time of Petitioner's trial, informed as it was by the evaluations performed by Drs. Don and Tatro, concludes that it was not unreasonable for Steinle to base his mitigation case on Dr. Tatro's diagnosis of a personality disorder rather than pursuing a theory that Petitioner suffered from brain damage and cognitive defects.

Petitioner has also failed to meet his burden of affirmatively proving that he was prejudiced by Steinle's performance. Although the record shows that Petitioner had mild brain atrophy at the time of the crime, and that he presently suffers from neurological deficits, Petitioner has not established that brain injury affecting his conduct was present at the time of the crimes. He has also failed to show that if such evidence existed it would have been more persuasive than the evidence of a personality disorder which the trial court

---

[17]     In *Stuard* all the experts, including the psychiatrist retained by the State, agreed that the defendant was brain damaged, that he was mentally impaired at the time of the crime, and that these conditions were in part responsible for his criminal conduct. 176 Ariz. at 606–08, 863 P.2d at 898–900. According to the State's expert, the defendant had poor impulse control and flew into a rage when confronted by the victims. *Id.*

accepted as mitigating, or that it would have supplemented rather than displaced such evidence.   Therefore, Petitioner has not shown a reasonable probability of a different outcome at sentencing if Steinle had investigated and presented evidence relating to Petitioner's brain trauma.

**(3)  Did trial counsel's failure to present a recommendation for leniency from the victim's father as mitigation evidence prejudice Petitioner?**

In its remand order the Court of Appeals affirmed this Court's denial of the claim on the merits, finding that Steinle's performance was deficient but accepting the state court's conclusion that it was not prejudicial.  *Scott*, 567 F.3d at 586.  However, the order instructed the Court to "reconsider" whether counsel's failure to present the recommendation for leniency at sentencing prejudiced Petitioner "in light of the other mitigating evidence counsel failed to present."  *Id.*

Background

Mark Milke's opinion concerning the appropriate sentence for Petitioner was set forth in the presentence report.  (Ex. 30.)  The author of the report noted: "Although Mr. Milke acknowledges Mr. Scott's involvement in this matter as an atrocious act, he does feel that, of the three defendants, Scott should be shown some leniency, as he did lead the police to his son's body and was instrumental in solving this case."  (*Id.* at 3.)  At the sentencing hearing the judge indicated that he had reviewed the presentence report after hearing the parties' evidence and arguments concerning aggravating and mitigating circumstances.  (RT 4/22/91 at 4.)   Steinle did not argue Mark Milke's leniency recommendation as a mitigating circumstance.

In the PCR proceedings Petitioner argued that trial counsel performed ineffectively by failing to urge the leniency request as a mitigating circumstance.  The court scheduled a hearing on the claim, but neither party presented evidence.  (Doc. 131, Ex. G at 3–7, Ex. C at 2.)  The court found that Milke's comments in the presentence report were "in the nature of a request for leniency," which if proffered had to be considered in mitigation if related to

- 47 -

Petitioner's character or the circumstances of the crime.  (*Id.*, Ex. C at 2.)  It further found that the request "was related to the circumstances of the offense (i.e., the Defendant's role in the crimes) and the assistance provided by the Defendant during the investigation."  (*Id.*)  The court rejected the State's contention that, because the court had previously found that Petitioner's assistance to authorities constituted mitigation, a request for leniency predicated on the same basis could not also constitute mitigation.  (*Id.* at 3.)  The court concluded that Milke's comments constituted mitigation but that Petitioner had failed to establish prejudice under *Strickland*:

> Considering the totality of the evidence before this Court at sentencing, there is no reasonable probability that Defendant's sentence would have been different had trial counsel urged Mr. Milke's comments as mitigation.  There is no basis whatsoever, much less a reasonable probability, for concluding that the additional mitigating circumstance would have altered this Court's conclusion that the mitigating circumstances were not sufficiently substantial to call for leniency.

(*Id.*)

Analysis

Having considered the effect of the omitted leniency recommendation, in conjunction with the new evidence presented at the evidentiary hearing, the Court concludes that Petitioner is not entitled to relief.

Beyond Mr. Milke's testimony at the evidentiary hearing, in which he confirmed that he had made the leniency recommendation and described his anguished state of mind at the time of Petitioner's sentencing (RT 10/5/10 at 14–18), Petitioner has presented no evidence to meet his burden of showing that he was prejudiced by this aspect of counsel's performance.  The trial judge was aware of the leniency recommendation prior to sentencing, despite Steinle's failure to argue it as a mitigating circumstance.  Steinle's performance did not prevent the trial judge from considering Mr. Milke's position.

Moreover, the Arizona Supreme Court has held that a leniency recommendation from a victim's family member does not constitute relevant mitigating information.  In *State v.*

- 48 -

*Williams*, 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995), the victim's sister recommended a life sentence because she did not want the defendant's family to suffer the way her family had suffered.  The court held that her opinion was not a relevant mitigating circumstance because it was unrelated to the defendant, his character, or the circumstances of the offense. *Id.*; s*ee also Booth v. Maryland*, 482 U.S. 496, 508–09 (1987); *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991).

Thus, during the PCR proceedings Petitioner received the benefit of a ruling by the trial judge that was not consistent with state law.  The judge found that the leniency recommendation did constitute relevant mitigation, but nonetheless ruled that Petitioner was not prejudiced by counsel's performance because the sentencing decision would not have been different if Steinle had raised the issue.

Because the trial judge was aware of Mr. Milke's opinion prior to sentencing, and because the leniency recommendation was not a relevant mitigating circumstance under Arizona law, Petitioner cannot show any impact, let alone a reasonable probability of a different outcome, from Steinle's failure to advance Mr. Milke's leniency recommendation as a mitigating circumstance.  Because no prejudice resulted from this feature of counsel's sentencing stage performance, and in light of the discussion above, reconsideration of this claim confirms that Petitioner is not entitled to relief.

**(4)   Petitioner's cumulative prejudice argument**

Petitioner argues that the Court, in evaluating prejudice from Steinle's performance at sentencing, must take into account factors in addition to Petitioner's brain injuries and Mr. Milke's leniency recommendation.  (Doc. 256 at 22, 25–26.)  These include Steinle's failure to present the proposed plea agreement as mitigating evidence and the trial court's failure to give proper consideration to mitigating evidence concerning Petitioner's troubled family background and history of alcohol abuse.  (*Id.*)

With respect to the former issue, Petitioner asserts that the Ninth Circuit in its remand

order "already held that Scott was prejudiced by Steinle's failure to present evidence of the state's plea offer . . . and this Court is not at liberty to disregard that finding." (*Id.* at 22.) Petitioner is referring to the appellate court's statement that "the plea offer's mitigatory effect is clear: the prosecution thought this was not a clear-cut death penalty case." *Scott*, 567 F.3d at 584 (citing *Summerlin*, 427 F.3d at 631 [sic]). This statement cannot be read as a determination that Petitioner suffered prejudice under *Strickland* as a result of counsel's failure to present the plea offer, and this Court finds no basis for such a conclusion.

The trial court was aware of the plea offer, which was discussed at a hearing on April 10, 1990. (*See* Ex. 202 at 5–6.) The offer itself was contingent on Petitioner's willingness to testify truthfully in the trials of co-defendants Milke and Styers. (Ex. 48; *see* Ex. 202 at 5–6.) As Steinle explained in his affidavit and during his testimony at the evidentiary hearing, Petitioner, along with refusing to read and sign the plea agreement, was unwilling to admit to his role in the crime, and the offer was withdrawn. (*See* Ex. 39 at 2; RT 10/6/10 at 283–84.) At the hearing before the trial court, the prosecutor stated that "the whole idea" of the plea offer was that Petitioner "would have to testify truthfully and accurately as to all the facts and circumstances surrounding the case." (Ex. 202 at 6.) Because he did not believe that purpose could be accomplished, the prosecutor told the court he would "rather go forward with a trial and just try Mr. Scott no matter what." (*Id.*) Based on this exchange and the terms of the plea offer, it is difficult to draw the conclusion that the prosecutor did not consider this a death penalty case. *Cf. Summerlin*, 427 F.3d at 640 (prosecutor offered to let defendant enter an *Alford* plea to second-degree murder because he "did not believe he could succeed in obtaining a death sentence given the facts and applicable law"). Under these circumstances, where the existence of the plea offer was a matter of record and where its mitigatory effect was debatable, the Court finds that no prejudice resulted from Steinle's failure to present the plea offer at sentencing.

Next, Petitioner contends that the trial court applied an unconstitutional "nexus" test

to the mitigating evidence and thereby failed to consider evidence of Petitioner's troubled childhood and history of alcohol abuse.[18]   (Doc. 256 at 26.)   Therefore, according to Petitioner, this Court must take those circumstances into account when determining whether Petitioner was prejudiced by Steinle's performance.  (*Id.*)  The Court disagrees.

In its remand order the Ninth Circuit noted that "[n]o court has weighed all of the mitigating evidence found by the trial court as well as the additional factor—lack of prior felony convictions—found by the Arizona Supreme Court against the aggravating factors found at trial." *Scott*, 567 F.3d at 584.  The court then explained that "it is possible that had Scott's counsel presented this additional evidence [i.e., evidence of traumatic brain injuries, the plea offer, and Mr. Milke's leniency recommendation] during sentencing, Scott might have received the lesser sentence of life without the possibility of parole" and "remand[ed] to the district court to make that determination." *Id.*  These instructions do not suggest that the trial court's consideration of the mitigating evidence was constitutionally infirm, nor do they authorize this Court to assess *Strickland* prejudice by substituting its own findings for "the mitigating evidence found by the trial court." *Id.*

In any event, the evidence concerning Petitioner's history of alcohol abuse and his family background, which was contained in the Rule 11 reports, Petitioner's life history, and the presentence report, does not constitute persuasive mitigation of the type found in cases where a defendant was prejudiced by counsel's performance.[19]  As discussed above, the

---

[18]   In *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court rejected the Fifth Circuit's screening test for mitigating evidence and held that a sentencing jury in a capital case must be allowed to consider such evidence whether or not the defendant could establish a nexus between the evidence and the crime.  In Petitioner's case the trial court found that Petitioner's troubled childhood and alcoholism were not mitigating circumstances because "the evidence fails to establish the necessary link between the condition in question and Defendant's role in these events." (Ex. 2 at 14.)

[19]   For example, in *Rompilla v. Beard*, 545 U.S. 374, 391–92 (2005), the petitioner was beaten by his father with his fists, leather straps, belts, and sticks, was subjected to verbal abuse, was locked "in a small wire mesh dog pen that was filthy and excrement

record indicates that Petitioner abused alcohol for a period of up to 20 years but had reduced his consumption in the years preceding the murder and was not intoxicated when the crime was committed.  He did not abuse any other substances.  While Petitioner's father was an abusive alcoholic who abandoned the family when Petitioner was a child, Petitioner maintained a loving bond with his mother.  These circumstances, particularly when viewed in light of the cold, calculated nature of the crime, do not constitute substantial mitigation.

In concluding its de novo review of the prejudice prong of Petitioner's ineffective assistance claim, this Court has considered Petitioner's "additional evidence" together with the mitigating circumstances found by the trial court and the Arizona Supreme Court.  *See Wiggins*, 539 U.S. at 534.  Against the totality of the mitigating circumstances the Court weighs the three aggravating factors found by the state courts.  As the trial court explained, these factors are "substantial": "Defendant's expectation of payment for his assistance is repugnant to the mores of a civilized society.  The young age of the victim, his inability to escape or defend himself, and the utter senselessness of the deed heighten the aggravated nature of the murder." (Ex. 2 at 17.)  There is no reasonable probability that Petitioner would not have been sentenced to death if Steinle had presented the evidence discussed above.

## CONCLUSION

The Court has undertaken a de novo review of Petitioner's ineffective assistance of counsel claims and determined that they are without merit.  Petitioner has failed to show that

---

filled," and was kept isolated from other children.  In *Wiggins* the petitioner suffered severe privation and abuse in the first six years of life, was physically tormented, sexually molested, and repeatedly raped after being placed in foster care, and was homeless for a period.  539 U.S. at 535.  In *Lambright v. Schriro*, 490 F.3d 1103, 1111 (9th Cir. 2007), the petitioner had a "long history of drug abuse," beginning at the age of nine when he was given sedatives by his mother.  *Id.*  When he returned from service in Vietnam he began drinking heavily and using drugs, including marijuana, acid, hashish, cocaine, and mushrooms.  *Id.*  He also began using crystal methamphetamine and staying awake for weeks at a time.  *Id.*; *see Turner v. Calderon*, 281 F.3d 851, 894 (9th Cir. 2002) (petitioner had extensive history of drug use, smoked two PCP-laced cigarettes a day, and claimed to have used PCP on the day of homicide).

Steinle performed deficiently under the deferential standard set forth in *Strickland*.  He has also failed to meet his burden of showing a reasonable probability that, but for the alleged deficiencies in Steinle's performance, the result of the voluntariness hearing and the sentencing proceedings would have been different.  Therefore, Petitioner is not entitled to habeas relief.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's claims of ineffective assistance of counsel are **denied with prejudice**.

**IT IS FURTHER ORDERED granting** a certificate of appealability on Petitioner's claim that counsel performed ineffectively at sentencing by failing to investigate and present mitigating evidence of Petitioner's traumatic brain injuries and their effect on his mental processes.  For the reasons set forth herein, the Court declines to grant a certificate of appealability on Petitioner's other claims.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in accordance with this Order and send copies of the Order to all counsel of record, to Petitioner, and to the Capital Case Staff Attorney.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 21st day of January, 2011.

Paul G. Rosenblatt
United States District Judge

- 53 -